**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSSOCIATED WITH **857-264-8026** THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE | No. 1:24-mj-00156-JCN<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Michael Bickford, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **857-264-8026** (hereinafter "the **8026** number"), which has service provided by T-Mobile US, Inc. ("T-Mobile"), which has offices at 4 Sylvan Way, Parsippany, New Jersey. T-Mobile records show **8026** is subscribed to "Gregorio DIAZ" of Springfield, Maine. The **8026** number is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. This warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definition of information collected by a "pen register" and/or "trap and trace device," see 18 U.S.C. § 3127(3) & (4). To ensure technical compliance with 18 U.S.C. § 3121-3127, the United States, by and through the United States Attorney's Office for the District of Maine, is submitting, contemporaneously with the Application for a Search Warrant and this Affidavit, an application and certification for an order authorizing the installation and use of a pen register, and a trap and trace device, on telephone number **857-264-8026**.

The requested information will be obtained pursuant to the authority of the warrant issued pursuant to 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41, as well as the authority of the Order issued pursuant to 18 U.S.C. § 3123.

3.  I have been employed as a Task Force Officer of the Drug Enforcement Administration ("DEA") since 2018. I am currently assigned to the DEA's Bangor, Maine Office within the New England Field Division. I am presently assigned to the Bangor, Maine, office and have received extensive training pertaining to narcotic investigations and the investigation of various crimes which arise from drug trafficking activities. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c). As a Task Force Officer, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. During my assignment with DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, methamphetamine, diverted pharmaceuticals, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections 841 and 846. I have conducted or participated in, among other things, surveillance, the execution of search and arrest warrants, debriefings of informants and confidential sources, and reviews of recorded conversations relating to narcotics trafficking. I have authored drug-related search warrant requests and successfully executed such warrants resulting in the seizure of drugs and other contraband, including firearms. I have also assisted in the execution of numerous drug-related search and arrest warrants. I have received extensive training in the field of narcotics enforcement and investigations. I am very familiar with the habits, methods, routines,

2

practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs, including the use of the internet, internet platforms, applications, and cellular telephones to facilitate those activities.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested warrant.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of federal law, to include 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, and 21 U.S.C. § 843(b) (hereinafter "Target Crimes") have been committed by one or more persons. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations.

6. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7. The DEA, together with partner agencies, has been investigating a subject known as Gregorio DIAZ who is known to use a T-Mobile cellular telephone assigned number of **857-264-8026** in the distribution of illegal controlled substances in the Springfield/Lee region of Maine. Specifically, the DEA has developed recent information through a confidential source (CS) that is signed up through the Maine

Drug Enforcement Agency (MDEA). The CS was signed up with the MDEA in September 2023.

8. In May of 2022, I was contacted by MDEA Special Agent (SA) Ron Blodgett. He advised me of a potential drug trafficking case that was originating from the Maine State Prison in Warren, Maine.

9. SA Blodgett advised he was contacted by investigator Christopher Therrien with the Maine State Prison in Warren. Therrien advised SA Blodgett that he has intercepted phone calls and text messages (messages sent and received by a prison issued tablet). Therrien believed that the messages and phone calls involved conversations related to drug trafficking. Therrien stated the calls and messages were between several individuals, including Pedro ROSARIO and Gregorio DIAZ.

10. Therrien explained that Pedro Rosario and Gregorio DIAZ were serving time at the State Prison, both for drug related convictions. Based on Therrien's review of Rosario's and DIAZ's text messages and phones calls, he believed they were working together and with other individuals both inside and outside of the prison to import methamphetamine from Mexico then to be transported to Rhode Island and eventually into Maine.

11. Therrien provided me with copies of text messages and audio phone calls between Gregorio DIAZ and a woman later identified as Pamela RODRIGUEZ. In the conversations, DIAZ instructed Rodriguez where to pick up methamphetamine and how to distribute the methamphetamine in Maine.

4

12. In October of 2022, I conducted an interview of Co-Conspirator 1 (CC1) at his home in Massachusetts.[1] CCI stated he knew DIAZ though an ex-intimate partner with whom DIAZ was incarcerated. CCI admitted that he spoke with DIAZ while DIAZ was in prison. CC1 also disclosed DIAZ instructed CCI to go Rhode Island to pick up two pounds of methamphetamine and then transport it to a residence in Maine.

13. CCI explained that he also spoke with Pedro Rosario while Rosario was incarcerated. The conversations were to confirm that CCI was going to Rhode Island to obtain the methamphetamine. CCI said that he received a call from an unknown male, thought to be Oscar HINOJOSA who provided CCI with directions to a bowling alley in Cranston, Rhode Island to obtain the methamphetamine.

14. Agents believe this male may be Hinojosa based on events that occurred in June of 2002. In June of 2022, Hinojosa was identified following the execution of a search warrant at a home in Cranston, Rhode Island which was in close proximity to the bowling alley. The search warrant was drafted after agents, including myself, observed Hinojosa and Nora Carranza REYES deliver four pounds of methamphetamine to Michaela Gray at the same bowling alley.[2]

---

[1] For all anonymized individuals the government will use masculine pronouns regardless of gender.

[2] Gray was initially targeted in this investigation after agents listened to jail calls and reviewed text messages between Gray and her boyfriend, who was incarcerated at Maine State Prison with Rosario. In June of 2022, after reviewing those calls and messages, agents suspected that Gray would be traveling to Rhode Island to obtain methamphetamine through arrangements made by Rosario and Gray's boyfriend. On about June 5, 2022, agents followed Gray to Cranston, Rhode Island and observed Hinojosa and Reyes with Gray. Agents stopped Gray in Maine on her return from Rhode Island. Agents subsequently located four pounds of suspected methamphetamine in her vehicle. Gray admitted to obtaining the narcotics from two individuals who placed the narcotics in her vehicle. On June 8, 2022, Gray committed suicide.

15.  CC1 disclosed to agents that a short time after CCI arrived at the bowling alley, a male arrived and placed a bag containing the methamphetamine in CC1's vehicle. CCI stated he then drove to Warren, Maine where he met CC2. CC2 subsequently drove CC1 to a location in Waldoboro where CC1 left half of the methamphetamine with an unknown male to sell. CC1 returned to CC2's residence, retrieved the other half of the methamphetamine he left there, and returned to Massachusetts.[3]

16.  In November of 2022, I conducted an interview with CC2. He explained that he had never met DIAZ but knew him through his ex-intimate partner who had spent time in jail with DIAZ. CC2 stated he spoke with DIAZ about a female DIAZ referred to as his sister (who is CC1) that would be coming to his house with methamphetamine to sell. CC2 stated CC1 arrived a few days later and asked CC2 to take him to a trailer park in Waldoboro. CC2 stated CC1 spent the night at the trailer and then called CC2 to be picked up the following day.[4]

17.  On January 6, 2023, Diaz was released from the Maine State Prison.

18.  In January 2024, I received information from other agents. Agents informed me that they have been receiving information that a Hispanic male using the name "Sin" or "SYN" had been in Penobscot County for several months selling drugs. A CS working for MDEA told agents that "Sin's" real name is Gregorio DIAZ. Agents provided me with multiple reports discussing DIAZ. Through a review of these reports, I was able to confirm that DIAZ a/k/a "Sin" or "SYN" is the same person that has been

---

[3] CC1 has proffered with the government and disclosed largely the same information.

[4] CC2 has testified in the grand jury pursuant to an immunity agreement.

6

identified as a target in this case. Some of the information contained in the reports is provided as follows:

   a. On September 29, 2023, an officer with the East Millinocket Police Department conducted a traffic stop of a red Toyota Tundra bearing Massachusetts registration plate 1ETR84. The driver of the vehicle was Jessica ARIAS who was identified by her Massachusetts driver's license. The officer identified the passenger to be Gregorio DIAZ. Arias and DIAZ explained to the officer they were staying at a hotel in Bangor but were in the area to visit a friend. Following the traffic stop the officer observed Arias pull into and stop at 531 Medway Road in Molunkus. The officer stated in his report that he knew this was the address of Matthew VANDINE and Travis MCMORAN. Both men have been identified by an MDEA CS as being involved in drug trafficking activity.

   b. On November 30, 2023, Deputies with the Penobscot County Sheriff's Office were called to the town of Enfield for a reported suspicious vehicle continually driving by the caller's home. When Deputies arrived, they did not locate the suspicious vehicle but were advised by the caller that she believed the driver to be "Sin" and that her father was holding a package for him. She was scared of "Sin" due to her hearing about him being violent. The caller did not know "Sin's" real name but indicated that he was "Dominican." Enfield, Maine is a small town just north of Bangor.

7

    c. On December 20, 2023, Agents with the MDEA conducted an interview of a cooperating source (CS) who was being housed in the Penobscot County Correctional Facility. The CS provided information about several people to include Gregorio DIAZ. The CS stated he relapsed and had been using heroin again for approximately four years. He advised agents of a "big target" that goes by the name "Sin", who agents already believed to be DIAZ. The CS stated he has been held at gunpoint by DIAZ and Vandine due to the CS owing DIAZ money for drugs. CS described the firearm as a black pistol with a silencer.

19. On January 1, 2024, DEA SA Rich along with MDEA SA Dan Gastia conducted an interview with a confidential source (CS) at the Old Town Police Department. The CS stated he is currently sober, but previously purchased drugs from Matthew VANDINE. According to the CS, Vandine and his girlfriend, Nicole "Nikki" TURCOTTE, sell both methamphetamine and heroin/fentanyl in northern Penobscot County, Maine. The CS further stated Vandine and Turcotte are supplied by a person known to the CS as "SIN." MDEA Agents know SIN to be Gregorio Dario DIAZ.

20. On April 29, 2024, MDEA SA Dan Gastia and I conducted an interview with a CS that wanted to provide information regarding DIAZ. The CS is signed up with MDEA and has been working with SA Gastia for several months. The CS has been found to provide accurate and reliable information.

21. The CS stated that DIAZ has moved into a home located at 521 Tar Ridge Rd in Prentiss, Maine which DIAZ has supposedly purchased. Also living in the home is

8

DIAZ's girlfriend who is only known to the CS as "Jessica" (thought to be Jessica ARIAS) and Tanya SEARLES. The CS said DIAZ and his girlfriend live in the upstairs of the home and that no one else is allowed to go up there.

22. The CS stated he has been hanging out with DIAZ and Searles. During that time, the CS has observed DIAZ with as much as 3 kilograms of suspected fentanyl at one time. The CS said the fentanyl was in a one-gallon zip lock baggie and claimed the bag was full.

23. The CS stated DIAZ does not sell to people, instead he resides with Searles and has Searles sell the product for him. The CS also stated that DIAZ does not collect the money for the drugs, the CS disclosed that Searles collects the money through Cash App which then goes on a Cash App debit card rather than into a bank account. The CS said that DIAZ fronts drugs to Searles for her to resell.

24. The CS said DIAZ had just returned from New York with methamphetamine. The CS disclosed that DIAZ travels to Pennsylvania to purchase fentanyl from his uncle. The uncle is unknown. The CS advised us that DIAZ always travels out of state to pick up drugs in a red Toyota P/U bearing Massachusetts registration, 1etr84. However, Diaz does not use the Toyota to travel around Maine.

25. On May 4, 2024, The CS messaged SA Gastia and advised he was in Lewiston, Maine with DIAZ and Searles to pick up methamphetamine. The CS stated he believes the residence they were at belonged to DIAZ. The CS also stated the methamphetamine was at the residence when they arrived. The CS then provided SA Gastia with a phone number for DIAZ, **857-264-8026** (the **8026** number).

26.  On May 6, 2024, I authored an administrative subpoena for connections records from T-Mobile. While reviewing the records, I observed the CS phone had been in contact with DIAZ's **8026** number on multiple occasions. The CS had previously provided SA Gastia and I with his number, this is also the number SA Gastia has been using to communicating with the CS.

27.  The CS stated he knows DIAZ is planning a trip to Pennsylvania soon to purchase fentanyl. When asked about this trip by agents, the CS stated DIAZ told him this information but indicated that DIAZ did not provide a date of travel. The CS stated DIAZ travels to obtain drugs after he has run out of product and that he does not have a normal travel routine. According to the CS, DIAZ uses at least two different cell phones to communicate with individuals. One is for personal conversations, and one is for his drug trafficking business. The CS stated DIAZ carries the **8026** phone with him and that he specifically uses this phone for drug trafficking business.

28.  This has been a long-term investigation into DIAZ and others involved in this conspiracy to obtain methamphetamine and fentanyl for distribution in Maine. The information sought by this warrant will aid in the investigation into those involved in the conspiracy, their methods of obtaining narcotics, their distributors, and potentially the source of the narcotics. The information sought may also assist investigators in determining patterns of behavior, travel, and location of the **8026** number.

### ADDITIONAL INFORMATION ABOUT WIRELESS CARRIERS

29.  In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and

generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

30. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the **8026** number, including by initiating a signal to determine the location of that phone on the T-Mobile network or with such other reference points as may be reasonably available.

31. Based on my training and experience, I know that T-Mobile can collect cell-site data about the **8026** number. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at

11

the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

32.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

33.    It is anticipated that the proposed warrant will be issued contemporaneously with a pen register and trap and trace order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information identified in Attachment B for each communication to or from the **8026** number, without geographic limit, for a period of thirty (30) days pursuant to 18 U.S.C. § 3123( c)(l).

34.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **8026** number would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not

authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

35. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile services, including by initiating a signal to determine the location of **8026** number on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

36. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **8026** number outside of daytime hours.

Respectfully submitted,

*[signature]*

Michael Bickford
Task Force Officer
U.S. Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: May 10 2024

City and state: Bangor, ME

Judge's signature

John C Nivison U.S. Magistrate Judge
Printed name and title

14